THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v. ANTHONY VIOLA and NICHOLAS MARRO, Appellants, and EDWARD KALBUS, Defendant.

Third Department, April 29, 1942.

*Arthur B. Lanphier*, for the appellants.

*Earle J. Wiley, District Attorney [Joseph B. Mulholland, Assistant District Attorney*, of counsel], for the respondent.

FOSTER, J.    Defendants appeal from judgments of conviction of the crimes of burglary in the third degree and petit larceny. Together with one Edward Kalbus they were charged with breaking and entering the store of Henry J. Powell, in the city of Troy, N. Y., with the intent to commit the crime of larceny therein; and, by a second count, of having committed larceny therein by stealing therefrom a quantity of dates and nuts, amounting in value to the sum of $21.05.    Kalbus was permitted to enter a plea of guilty to the crime of unlawful entry.    The appellants stood trial, were convicted of the crimes charged, and each was sentenced as a second offender to a term of imprisonment of not less than ten and not more than twenty years.    A discussion of errors, alleged to have been committed on the trial and said to have been prejudicial, requires a brief statement of the facts developed.

Powell conducted a vegetable and produce store near the junction of Fourth and Hill streets in the city of Troy.    The store building was triangular in shape and faced both on Fourth street and Hill street.    On the Fourth street side there was an outside cellar entrance consisting of steps leading down from the sidewalk to a door at the bottom of them.    There were also sidewalk entrances to the store on both streets.

The appellant Marro had been employed by Powell for several months prior to December 7, 1940, the date on which the alleged crimes are said to have taken place.    Powell testified that on the afternoon of that day he sent Marro into the cellar of the store and directed him to clean it up.    After the latter had left the premises Powell found that the outside cellar door had been left open for a few inches and empty crates piled against it on the inside.    He also found that a bolt on the door had been slipped back and a nail, which had been driven into the door behind the bolt to hold it securely, had been removed.    He called this condition to the attention of a member of the Troy police force, Officer Morine. They disagreed in their testimony as to whether the door was open or closed.    Powell testified that it was open several inches, and Morine testified that it was closed.    In any event, they left it in the same condition that Powell found it.    He stated on cross-examination that previously goods had been missed from the store, and that the cellar door was left in the condition in which he found it for the purpose of catching whoever might be responsible for the thefts.    Apparently in furtherance of this plan he gave a key to a barber shop across the street to Morine.    This barber shop was located directly across from the cellar entrance.    About ten o'clock that night Morine came back to the store, tried the doors on the sidewalk level and found them locked, and then looked at

the cellar door but evidently did not try it. He said that it was apparently closed but he could not tell whether it was bolted. He stayed in the barber shop until nearly midnight, when he saw a black sedan automobile drive up and stop in front of a gasoline station just north of the store. He testified that the appellants, Marro and Viola, alighted from this automobile, went down into the cellar entrance to the store and later emerged with some cardboard packages, re-entered the car and drove away. Being unable to follow the car, he sought the assistance of another policeman, whose name was Kirkpatrick and who had taken a position in a railroad flag shanty overlooking the Hill street entrance to the Powell store. After talking with Kirkpatrick, Morine left the flag shanty, and just as he was doing so he saw a car coming up Hill street which bore the same license number he had observed on the black sedan. After some maneuvering this car was stopped, and the appellant Viola and another man, evidently Kalbus, were found in it. They were arrested and taken to a police station. Five boxes were found in the car, three boxes of dates and two boxes of nuts, and also an overcoat. Powell identified the boxes as his property, and Marro, who was apprehended the following morning, admitted that the overcoat belonged to him.

It may be readily seen from this resumé that the People had a strong case and unless substantial error can be pointed out there would be no justification for a reversal of the convictions. Some of the errors assigned by appellants have no substance as a matter of law. Such, for instance, is the claim raised by demurrer that the indictment was insufficient because, among other things, it failed to allege a felonious intent. The indictment charged a breaking and entering the premises with the intent to commit a crime therein, which is the language of the statute and is sufficient. (Penal Law, § 404.) Nor does the argument that the evidence was not sufficient to establish burglary, because there was no breaking, have any support as a matter of law. The term "breaking" has a greatly extended significance as defined by statute, and includes opening by any means whatever any outer door of a building or by obtaining entrance by any artifice. (Penal Law, § 400.) There is no requirement that violence must be shown, a latch lifted or a bolt drawn. Nor is there any requirement that the door must be tightly closed. If it is closed to such an extent, or in such a manner, so that some effort must be made to open it far enough to admit the body of a person, and it is opened for that purpose, the element of breaking is present. If the jury accepted the People's testimony, they were justified in finding a breaking under the statute.

Appellants assert that evidence of previous crimes was improperly admitted. We do not find that any such evidence was left in the record, but there are some instances where some references, more or less damning, were made to previous crimes. For instance, the district attorney asked the witness Morine whether the appellant Viola, when questioned by the police, admitted that this was the second time he had burglarized the Powell store. This question was objected to and the objection overruled, but the question does not appear to have been answered. Later the witness Kirkpatrick testified that Viola had made a statement to him that once before he and Marro had burglarized the store. This testimony was stricken out and the jury instructed to disregard it. Again the witness Burkhardt testified that Marro had told him in response to a question as to what he did with the stuff when he stole it that " they used to bring it up to Cohoes." This testimony was stricken out also.

With the one exception the trial judge did all that was possible under the circumstances to protect the rights of appellants, and to limit the consideration of the jury to the issue at hand. Nevertheless an insidious impression of other crimes must have been implanted in the minds of the jurors. Considered in conjunction with the remarks of the district attorney, when he referred to the failure of appellants to produce character witnesses, these detrimental references to other crimes may well have exercised a powerful influence in creating an atmosphere decidedly prejudicial to appellants.

The remarks of the district attorney referred to were evidently not casually uttered but advanced as a serious argument. After objection had been made and the court had ruled that the question of good character was not an issue the district attorney continued to press his argument in this language: " Evidence of good character prior to the commission of this crime, may, of itself, be taken by you to create this reasonable doubt, which might give these defendants a chance to escape conviction. And I say to you: Was there no one in the City of Troy that these two defendants could secure? A friend, a relative, a former school teacher, a clergyman, a former employer, or anybody else, to come into this court and say that either of these two men is to be believed, or had evidence of good character before the commission of the crime? "

At the conclusion of these remarks counsel for appellants each asked for the withdrawal of a juror and for a mistrial. Their requests were denied. In view of the fact that appellants had not taken the stand as witnesses in their own behalf, or offered any testimony as to their character, this argument of the district

attorney was improper and prejudicial. In his charge the trial judge instructed the jury that the issue of good character was not in the case and they were, therefore, not to consider it. Whether, under all the circumstances, these instructions were sufficient to remove any prejudicial impression created in the minds of the jurors must remain a matter of conjecture.

Another error assigned was the ruling of the trial judge in refusing appellants' request to produce evidence that their confessions were not voluntarily made. On the trial a written statement signed by Marro and one signed by Viola, differing somewhat as to details, but each amounting to a confession of guilt, were introduced in evidence. In addition several police officers testified to oral admissions made by appellants to substantially the same effect as those contained in the written statements. During the direct examination of the police officer Morine, and when the district attorney reached an interrogation point as to oral admissions made by Viola, counsel for the latter asked to cross-examine Morine preliminarily on the subject. This request was granted. When Officer Kirkpatrick was on the stand he also testified to some oral admissions made by Viola, and in connection with this testimony no request was made by counsel for either appellant for a preliminary cross-examination. However, counsel for Viola in his regular cross-examination of Kirkpatrick cross-examined the latter at considerable length as to what took place in the station house and the circumstances under which Viola signed a statement. Again when the police officer Burkhardt was on the witness stand for direct examination and testified as to oral admissions made by Viola no request was made to examine him preliminarily as to whether such admissions had been extorted by duress; and the same is true with relation to his testimony concerning oral admissions made by Marro. Thereafter, however, counsel for both appellants cross-examined Burkhardt closely concerning both oral admissions and written statements and the circumstances under which they were made by the appellants. In all of these examinations the police officers denied that any coercion was used in obtaining admissions from appellants, but it was developed that Viola was taken ill while at the police station; and also that Marro's wife was in the hospital when he was being questioned. At the end of Burkhardt's cross-examination the written statements were offered in evidence. They were strenuously objected to and the objections overruled, the trial judge stating that he would leave it to the jury to say whether the statements had been freely and voluntarily made. Counsel for both appellants then asked for permission to produce witnesses to show on an examination pre-

liminary to the admission of the statements in evidence that one had been obtained under promise of immunity and the other under duress. These requests were denied by the court and the written statements were then admitted in evidence. Later when the district attorney sought to read the statements to the jury counsel for appellants made the same requests for a preliminary hearing and the opportunity to produce evidence as to the circumstances under which the statements were made. These requests were again denied and finally the statements were read to the jury but certain portions which had nothing to do with the charges under consideration were deleted.

This refusal to permit appellants to produce evidence that their written confessions were not voluntarily made before the same were admitted in evidence we are compelled to regard as error. Whether the appellants could have produced such evidence we are not called upon to determine, nor was the trial judge authorized to determine that question without giving appellants an opportunity to be heard. Their right to a hearing upon this issue and to produce what evidence they could was nearly absolute. (*People* v. *Doran*, 246 N. Y. 409; *People* v. *Rogers*, 192 id. 331; *People* v. *Brasch*, 193 id. 46; *People* v. *Fox*, 121 id. 449.) We further think that this right was not limited by the cross-examination of the People's witnesses already had before the written statements were offered in evidence and the requests made; nor was it limited by the fact that alleged oral admissions were already in evidence. (*People* v. *Nunziato*, 233 N. Y. 394.) Written admissions are far more potent than alleged oral admissions. We are aware, of course, that there are limits to which a preliminary examination may be pursued before confessions are received in evidence, and these limits must necessarily be determined in some measure by the sound judgment and discretion of the trial judge. But the requests of which we now speak were not limited to merely preliminary cross-examination but had to do rather with an opportunity to produce direct evidence to show that the confessions were not voluntarily made. Appellants were entitled to such an opportunity before the written admissions went in, and could not be fairly compelled to wait until the People had rested.

Without discussing other matters connected with the trial, and which are also claimed to be prejudicial, we are convinced that the foregoing circumstances should not be overlooked or tossed aside on the theory that the proof against appellants was strong and that none of their substantial rights were invaded. It may be readily acknowledged that these circumstances, taken singly, would not ordinarily be regarded as substantial and sufficient to

require a reversal where the proof of guilt is strong. But when taken together, and their cumulative effect considered, they cannot be deemed as harmless. In the interests of justice the convictions should be reversed and a new trial granted.

HILL, P. J., CRAPSER, BLISS and SCHENCK, JJ., concur.

Judgments of conviction reversed on the law and a new trial granted.