Justine Wise Polier, J.
The five respondents were brought before this court on petitions filed by a detective. Pour of the boys were represented by a law guardian and the fifth by private counsel.
The petitioner testified that on receipt of a phone call reporting an impending gang fight, he and his partner proceeded to the reported site at Avenue D and East 3rd Street. There they observed a group of 10 to 12 youths congregated in the doorway of a grocery store at about 8 o’clock at night. The petitioner approached the group and began to question them *901 collectively as to where they lived and what they were doing at this spot.
As he began his questioning, one of the respondents “ George Walsh ”, started walking away and the officer reached out. The officer testified: “ I reached out and grabbed hold of him, as I grabbed hold of him, I felt a hard object in his jacket pocket. I pulled his hand out of his pocket. In his pocket was a 6-inch meat cleaver. We then frisked the other boys in the group, and on ' Tom Lang ’ we found a bicycle chain. ’ ’
The police identified themselves after the meat cleaver was found and proceeded to frisk the other boys and make the arrests. On questioning, the five boys admitted, according to the petitioner’s testimony, that they knew that there was a group of boys coming over from Brooklyn to have a fight but claimed that they were not going to take part in the fight. One of the respondents, “ James Smith” admitted that he had been in possession of the meat cleaver and had passed it to “ George Walsh ” prior to the time when the police began their questioning.
Counsel for the respondents objected to the arrests and moved to suppress the evidence, namely the meat cleaver and bicycle chain, on the ground that the officers had not secured warrants prior to making the arrests. Counsel take the position that the action of the detectives constituted an unlawful search and seizure and that therefore the weapons discovered were illegally obtained and in violation of the Fourth Amendment.
Mapp v. Ohio (367 U. S. 643) is cited. That decision mandated the exclusion of evidence illegally obtained from introduction in State as well as Federal courts. It does not, however, answer the question before this court whether the meat cleaver and the bicycle chain, found in possession of two of the respondents, were illegally obtained, or whether securing them constituted an illegal search and seizure.
In the instant cases the police officers, after being alerted to an impending gang fight at a specific street corner in this city, proceeded to the spot in an attempt to prevent such a fight. When they found 10 to 12 boys congregated in a doorway, their questioning the boys as to their addresses and their purpose in being there constituted a procedure essential to preventive police work. - That no crime had yet been committed or was being committed at the time they reached the scene did not lessen the obligation of the police to prevent a crime or require them to wait until criminal action appeared imminent. There is no doubt that the right of the police to stop and inquire is *902 justified for a cause less conclusive than that which would sustain an arrest. (See People v. Rivera, 14 N Y 2d 441.)
The real question is whether the police, while engaged in such questioning, if alerted to the possible possession of a weapon on a person being questioned, have the right to frisk such a person.
The Court of Appeals has in two recent decisions upheld the right of police officers to frisk as an incident to inquiry in cases where the defendant’s conduct was suspicious and warranted inquiry. In People v. Rivera (14 N Y 2d 441, supra), the police observed the defendant and another man pacing back and forth and looking into a bar and grill. When the two men began to walk in another direction as the detectives approached, the detective ordered them to stop and frisked the defendant. He felt a hard object and removed a loaded pistol. A motion to suppress the evidence on the ground it was obtained by an illegal search and seizure was granted by the Supreme Court. This decision was affirmed by the Appellate Division without opinion. (38 Misc 2d 586, affd. 19 A D 2d 863.) However, the New York Court of Appeals reversed the decisions of the lower courts, stating that the question before it was (38 Misc 2d 586, 587): ‘ ‘ whether a weapon discovered by a police officer as the result of a frisk of a person whom he has seen acting suspiciously and is lawfully about to question, but for whose arrest there is no probable cause, is admissible against that person upon his trial for possession of that weapon, or whether it must be suppressed as the product of an unreasonable or illegal search and seizure.”
The Court of Appeals pointed out that it is the business of the police to prevent crime and stated (pp. 444, 446, 447):
“ Prompt inquiry into suspicious or unusual street action is an indispensable police power in the orderly government of large urban communities. * * *
“ If we recognize the authority of the police to stop a person and inquire concerning unusual street events, we are required to recognize the hazards involved in this kind of public duty. * * * We think the frisk is a reasonable and constitutionally permissible precaution to minimize the danger. * * *
“It is something of an invasion of privacy, but so is the stopping of the person on the street in the first place * * *
“ And as the right to stop and inquire is to be justified for a cause less conclusive than that which would sustain an arrest, so the right to frisk may be justified as an incident to inquiry upon grounds of elemental safety and precaution which might not initially sustain a search. * * *
*903 “ The question is not what was ultimately found, but whether there was a right to find anything.
“From the time the policeman, in the process of frisking defendant, touched the object, inferred by him correctly to be a gun, there was probable cause to arrest defendant and to proceed at once further to invade his clothing and take the gun.
“ The constitutional restriction is against unreasonable searches, not against all searches. And what is reasonable always involves a balancing of interests: here the security of the public order and the lives of the police are to be weighed against a minor inconvenience and petty indignity. ’ ’
In People v. Pugach (15 N Y 2d 65) a defendant had been asked to accompany detectives to the police station for questioning on “another matter.” In the squad car, one of the detectives had opened the brief case which the defendant had been carrying and found a loaded pistol. The defendant took the position that, absent a record as to the “other matter ”, no probable cause existed for an arrest, absent which the search of his brief case was illegal. The Court of Appeals, however, affirmed the conviction, stating that the Fourth Amendment proscribes “ unreasonable ” searches and seizures and that (p. 69): “ The determination of unreasonableness depends on surrounding facts and circumstances and, as we have said, ‘ involves a balancing of interests ’ ’
The court cited People v. Rivera (supra), where it noted (p. 69), “We took pains to point out that the right to ‘ frisk ’ is justified as an incident to an inquiry upon grounds of safety and precaution which might not initially sustain a search ”.
In the instant case the police were fulfilling their duty in questioning the youths found assembled at the exact spot where the police had been warned of an impending gang fight. The frisking of the youths fell clearly within the “ reasonable and constitutionally permissible precaution to minimize danger ” that the New York courts have regarded as an indispensable police power if the police are to prevent crime in large urban areas. The action of the police did not constitute an unreasonable search. The motion to suppress the meat cleaver and bicycle chain is therefore denied.
The respondents have exercised their right to remain silent. (Family Ct. Act, § 741, subd. [a].) In the absence of more than admissions out of court the cases must be dismissed against “ James Smith ”, “ Walter Bridges ” and “ Sam Ball ”. The preponderance of the competent, material and relevant evidence establishes that “ Tom Lang ” and “ George Walsh ” went to Avenue D and 3rd Street on the night of November 10, 1964, *904 where they assembled with other youths in anticipation of a gang fight. “ Tom Lang” had in his possession a three-foot bicycle chain and “George Walsh ” had in his possession a six-inch meat cleaver. Finding is made that “ Tom Lang ” and “ George Walsh” are delinquents in that they were part of an unlawful assembly and were carrying dangerous weapons in violation of law.
This case raises an additional issue which calls for corrective legislation.
The New York State Family Court is a civil court. The definition of delinquency has been narrowed to cover acts committed by children under sixteen which would constitute crimes if committed by adults (Family Ct. Act, § 712, subd. [a]). While thus narrowing the definition of juvenile delinquency, the Act, to protect the rights of children, has also instituted procedures formerly required only in the criminal courts. At the commencement of every hearing, the Judge is required to advise the child of his right to remain silent, his right to be represented by counsel of his own choosing, and of his right to have a law guardian assigned (§§ 728, 741).
Law guardians have been provided to defend the rights of children, and appropriations for their cost are made a charge on the budget for each Appellate Division payable by the State of New York (§§ 241-249). No similar provision is made for the presentation of the cases alleging delinquency.
While the Board of Education and the Police Department have counsel in some cases, there is no one to present the case where a private citizen is the petitioner. Even where as in the instant case a police officer is the petitioner, counsel for the Police Department have neither the staff nor time adequately to prepare their cases or to submit briefs.
As a result of this situation, the court is all too often required to question the complaining witnesses on the basis of the petition and then have the law guardians exercise the right and duty of cross-examination. Such a procedure does not provide for adequate preparation or presentation of the testimony against the child. It also places the court in the untenable position of having to seek the facts on which a petition of delinquency is based, hear the defense, and then undertake to evaluate and pass on the evidence as a Judge.
In the instant case where briefs were submitted by the law guardian and private counsel, none was submitted by the police. Neither of the briefs submitted cited any of the relevant decisions in this State which have held that a frisk of a defendant under certain circumstances ayus a reasonable and constitu *905 tionally permissible precaution to minimize the danger of a policeman who is trying to determine whether a crime has been or is about to be committed. Neither brief referred to the cases holding that a frisk under certain circumstances which results in the discovery of weapons is to be distinguished from an illegal search and seizure. (See People v. Rivera, 14 N Y 2d 441, supra; see, also, People v. Peters, 44 Misc 2d 470.)
The provision for law guardians has inevitably introduced adversary proceedings into the Juvenile Term of court. There is no question that the presence of the Iuav guardians is desirable to protect the rights of children brought before the court on petitions alleging that they have committed acts which would constitute crimes if committed by adults. As a consequence, there are invoked the legal procedures to which defendants in the Criminal Courts are entitled, the preparation of witnesses, cross-examination of the petitioners and complaining witnesses, and the preparation of briefs on questions of law.
In contrast, where a citizen files a petition alleging that an offense has been committed against him or his child, there is no one to interview the petitioner or complaining witnesses prior to the trial, no one to conduct the direct examination other than the Judge, no one to cross-examine the respondent and his Avitnesses other than the Judge, and no one to prepare a brief on questions of law. As a result of this situation the Police Department has assigned one lawyer to the Juvenile Term in New York County, and the Board of Education provides counsel in some cases which are regarded as of special significance. There is, however, no legal staff comparable to that of the law guardians.
Thus, the present law results in a paradoxical situation. The criminal courts are increasingly required to secure counsel for defendants so that their rights will be protected in actions brought by prosecuting officers representing the People. The Family Court, on the other hand, provides counsel for defendants and no personnel or machinery to assure the adequate presentation of cases against minors even Avhen they are charged with acts which would constitute a felony if committed by an adult.
In the Juvenile Term of the Family Court in NeAV York City where a Judge must hear and dispose of 50 to 75 cases a day, it is impossible as well as unwise for the Judge to undertake the presentation of the facts on behalf of the petitioner. In addition, the present procedure leads to the petitioner and complaining Avitnesses being subjected to cross-examination *906 without having legal guidance in the direct examination. A sense of injustice and even harassment sometimes results.
This basic lack of staff to present cases properly in what has become an adversary proceeding is aggravated not only by the heavy calendars, but by the fact that the Judges of the Family Court have no law secretaries or legal assistants. In cases like the instant one where a question of law arises and the law guardian submits a brief for the defendants and no brief is submitted by the petitioner’s counsel, or the petitioner is without counsel, the Judge must without any assistance undertake the review of the law.
Unless legislation is enacted to correct the present imbalance in legal services and to provide fox adequate legal assistance and judicial manpower, there is grave danger that cases will he dismissed for lack of proper presentation, that citizens will be discouraged from seeking redress in the court, and that legal questions will not he given adequate consideration. The present situation inevitably results in injury to citizens, to delinquent children, and to the entire community.